UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

JOSHUA MCNEIL,

                Plaintiff,

v.

WAYNE VRADENBURGH and CITY OF
NEWBURGH.,

                Defendants.

--------------------------------------------------------X

**MEMORANDUM OPINION
AND ORDER**

18-CV-09353 (PMH)

PHILIP M. HALPERN, United States District Judge:

Plaintiff Joshua McNeil ("Plaintiff"), commenced this action on October 12, 2018 and presses claims against Wayne Vradenburgh ("Vradenburgh") and the City of Newburgh (the "City," and collectively, "Defendants") related to his allegedly wrongful termination. (Doc. 1, "Compl."). Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e, *et seq*. ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and the First Amendment. (*See generally id*.).

Defendants moved, by motion dated March 2, 2020, for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 39; Doc. 43, "Defs. Br."). Plaintiff filed a brief in opposition to Defendants' motion on June 11, 2020 (Doc. 53, "Pl. Br.") and the motion was fully submitted with the filing of Defendants' reply brief on July 1, 2020 (Doc. 56, "Reply").

For the reasons set forth below, Defendants' motion is GRANTED.

## BACKGROUND

The facts, as recited below, are taken from Plaintiff's Complaint, Defendants' Local Civil Rule 56.1 Statement (Doc. 44, "56.1 Stmt."), Plaintiff's opposition to the Rule 56.1 Statement

(Doc. 54, "56.1 Opp'n"), and the admissible evidence submitted by the parties.

Plaintiff, an African American male, was hired by the City on March 17, 2014 as an Assistant Maintenance Mechanic for the City's Water Department. (Compl. ¶ 10; 56.1 Stmt. ¶ 1). Plaintiff's employment was for a three-year probationary period. (56.1 Stmt. ¶ 8 (citing Doc. 52, "Monroe Decl.," McNeil Dep.[1] at 22:20-25)). The Assistant Maintenance Mechanic is an entry level position within the Water Department, and Plaintiff reported to the Maintenance Mechanics who, in turn, reported to the Deputy Superintendent of the Water Department. (*Id*. ¶¶ 17-18). Plaintiff's primary job duty was to assist the Maintenance Mechanics in any way that was requested by them.[2] (*Id*. ¶ 19).

At the time Plaintiff was hired, Jeff Wyans ("Wyans") was the City's Water Superintendent and Reynaldo Santiago ("Santiago") was the Deputy Superintendent. (*Id*. ¶ 7). After Wyans and Santiago departed, at some time in 2015 or 2016, Vradenburgh was promoted to the position of Deputy Superintendent; and, thereafter, Plaintiff reported directly to Vradenburgh. (*Id*. ¶¶ 13, 16 (citing Doc. 42, "Mehnert Decl." Ex. D, "Vradenburgh Dep." at 41:22-42:5)).

---

[1] Portions of Plaintiff's deposition transcript were filed by Defendants and attached as exhibits to the Declaration of Matthew J. Mehnert. (Doc. 42-2). Plaintiff, in support of his brief in opposition to Defendants' motion, attached his entire deposition transcript to the Declaration of James E. Monroe as three separate exhibits. (Docs. 52-2–52-4). For ease of reference, the Court refers to Plaintiff's deposition transcript as "McNeil Dep."

[2] Plaintiff denies Defendant's characterization of his job duties, and states instead that "Plaintiff and his African/American co-workers performed the majority of medial [sic] tasks." (56.1 Opp'n ¶ 20). Plaintiff cites to no evidence in support of this assertion. The Local Rules of the United States District Courts for the Southern and Eastern Districts of New York instruct that a "paragraph in the [movant's] statement of material facts . . . will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(c). Furthermore, "[e]ach statement by the . . . opponent . . . *including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible . . . .*" *Id*. at 56.1(d) (emphasis added). Because Plaintiff cites to no evidence, the Court considers Defendants' statement of material fact regarding the scope of Plaintiff's job duties to be deemed admitted. As is evident from Plaintiff's opposition to Defendants' Rule 56.1 Statement, this is a recurring issue. Thus, and in accordance with the Local Rules, the Court deems Defendants' statements of fact admitted unless controverted by Plaintiff *and* supported by evidence.

2

According to City procedure, if an employee believes there has been a violation of the City's Ordinance on Workplace Violence Prevention, the employee writes an incident report related to the incident and sends the report to the City Manager and Corporation Counsel's Office for review. (*Id.* ¶ 29 (citing Vradenburgh Dep. at 54:14-55:5)). After an incident report is submitted, the City retains an outside company to investigate the allegations raised in the report and make conclusions and recommendations. (*Id.* ¶ 30 (citing Vradenburgh Dep. at 57:24-58:7)). From November 2015 through June 2017, the City, on four separate occasions, retained an investigator to investigate allegations of workplace misconduct related to Plaintiff that were raised in incident reports. Those investigations are described below.

I.    The November 2015 Investigation

In November 2015, an investigator was hired by the City to investigate three separate incidents involving Plaintiff. (*See generally* Mehnert Decl. Ex. H, "Nov. City Rep."). The primary incident investigated occurred on August 21, 2015 when Plaintiff got into a verbal altercation with his supervisor, Maintenance Mechanic Steve Brodsky ("Brodsky"). (56.1 Stmt. ¶ 27 (citing McNeil Dep. at 152:7-154:2; *see generally* Nov. City Rep.)). After the August 21 incident, both Plaintiff and Brodsky filed incident reports with the City. (*Id.* ¶ 28 (citing Nov. City Rep. at 2-4)). According to Plaintiff, he had complained to Brodsky that a co-worker, Leo Schnetzler ("Schnetzler"), had spoken to him in a rude, disrespectful, and inappropriate manner including calling Plaintiff an "asshole and fucking dummy." (Nov. City Rep. at 2). After Brodsky addressed the situation in a way that Plaintiff believed to be insufficient, Plaintiff told Brodsky that he was going to report Schnetzler's comments to "higher ups." (*Id.*). According to Brodsky, Plaintiff accused Brodsky of giving certain employees preferential treatment and raised his voice to Brodsky. (*Id.* at 3). Brodsky denied that he had acted with racial bias towards anyone. (*Id.* at 4).

During the course of the investigation into the August 21 incident, Plaintiff presented two additional incident reports related to other incidents between Plaintiff and co-workers that also occurred in August 2015. According to Plaintiff, on August 18, 2015, Plaintiff got into a verbal altercation with Schnetzler about Schnetzler's use of his cell phone on the job (*id*. at 5), and on August 20, 2015, Plaintiff claimed that Vradenburgh unnecessarily "caus[ed] panic and distress" while Plaintiff was working. (*Id*.).

The investigator recommended, in a report dated November 13, 2015, that the City issue a Counseling Memorandum to Plaintiff because Plaintiff had "exhibited behaviors that have contributed to [a] negative work environment" and had "demonstrated a lack of respect for his co-workers as well as Mr. Brodsky." (*Id*. at 23). The investigator recommended that Plaintiff be given a Counseling Memorandum to "send a strong message that further violations will result in disciplinary action, up to and including termination of employment." (*Id*. at 25). The investigator recommended that the City take other actions as well involving other City employees including issuing a Counseling Memorandum to Schnetzler, providing supervisor and employee training, providing diversity training, and developing a cell phone use policy. (*Id*. at 25-26). On February 11, 2016, Plaintiff was given a Counseling Memorandum by the City Manager, who had adopted the investigator's findings. (56.1 Stmt. ¶ 33 (citing Mehnert Decl. Ex. I, "Counseling Mem.")). The Counseling Memorandum notified Plaintiff that he had violated the City's Workplace Violence Prevention Policy and that he had unnecessarily provoked his fellow coworkers. (Counseling Mem. at 1-2).

II.   The April 2016 Investigation

A second investigation was conducted in April 2016 related to incidents involving Plaintiff and Vradenburgh that took place in February 2016. (56.1 Stmt. ¶¶ 35-37 (citing Mehnert Decl. Ex.

4

J, "Apr. City Rep.")). According to Vradenburgh, on February 2, 2016, Plaintiff disobeyed a direction from Vradenburgh and Plaintiff accused Vradenburgh of being racist. (Apr. City Rep. at 2-3, 5-6). On February 5, 2016, Vradenburgh apparently arrived at a job site and questioned whether Plaintiff and another employee had directed him to the proper location. (*Id*. at 7). A third incident occurred on February 12, 2016 and involved a contentious verbal exchange between Plaintiff and Vradenburgh. (*Id*. at 10-14). A fourth incident occurred on February 24, 2016 and involved Vradenburgh telling Plaintiff how to use a demo saw because Vradenburgh believed Plaintiff was using the saw in a dangerous manner. (*Id*. at 15-24). The investigator who investigated these incidents concluded, in a report dated April 15, 2016, that Plaintiff had engaged in several acts of insubordination and had not been truthful during his interview with the investigator. (56.1 Stmt. ¶¶ 36-37 (citing Apr. City Rep. at 25-28)). Plaintiff stated that he was truthful during the investigation and disagrees with the conclusions reached by the investigator. (56.1 Opp'n ¶ 37). The investigator recommended that "the City should proceed with corrective action against [Plaintiff] on the basis of the insubordination that he displayed on February 2, 2016, and for providing false information in the course of a workplace investigation." (Apr. City Rep. at 28). The City adopted the investigator's recommendations, suspended Plaintiff without pay for four days, and issued a letter of reprimand on July 29, 2016.[3] (56.1 Stmt. ¶ 38 (citing Mehnert Decl. Ex. K)).

III.   The June 2016 Investigation

On April 22, 2016, another verbal altercation occurred between Plaintiff and Vradenburgh. (*Id*. ¶ 39 (citing Mehnert Decl. Ex. L, "June City Rep.")). After Vradenburgh perceived Plaintiff

---

[3] Plaintiff admits that he was suspended without pay, but disputes that he was insubordinate and states that he was merely "responding to acts of racial discrimination" and that "he was suspended for attempting to bring this racial discrimination to light." (56.1 Opp'n ¶ 38). Plaintiff cites to no evidence in support thereof.

to be disobeying his directions, he directed Plaintiff to go home for the day. (June City Rep. at 1). Plaintiff apparently refused and stated "No, I don't have to listen to you." (*Id.*). The investigator concluded, in a report dated June 6, 2016, that Plaintiff "was insubordinate in refusing to go home for the day after being directed to by his supervisor, Mr. Vradenburgh." (*Id.* at 6). The investigator recommended that the City proceed with corrective action "on the basis of the insubordination that [Plaintiff] displayed on April 22, 2016."[4]  (56.1 Stmt. ¶¶ 40-41 (citing June City Rep. at 6)). The City adopted the investigator's report and Plaintiff was suspended without pay for eight days and issued a letter of reprimand on November 15, 2016.[5] (*Id.* ¶ 42 (citing Mehnert Decl. Ex. M)).

IV.    The March 2017 Investigation

A fellow coworker, Frank Grady ("Grady"), filed a report on February 8, 2017 stating that he believed Plaintiff had made a racist comment. (*Id.* ¶¶ 43-44 (citing Mehnert Decl. Ex. N, "Mar. City Rep.")). According to the report, Plaintiff made a comment to Grady about "monkeys training their trainers." (56.1 Opp'n ¶ 43 (quoting Mar. City Rep. at 1)). Plaintiff maintains that Grady misinterpreted the comment and it was not intended to be racist in nature. (*Id.*). An investigator was retained for the fourth time to investigate the incident, and the investigator concluded that Plaintiff had made derogatory comments towards his coworker. (56.1 Stmt. ¶¶ 45-46 (citing Mehnert Decl. Ex. N)). Specifically, the investigator concluded, in a report dated March 9, 2017, that Plaintiff had, in fact, made the comment at issue and that the statement was "degrading and not appropriate for the workplace." (Mar. City Rep. at 14). The City adopted the investigator's

---

[4] Plaintiff claims that he was not being insubordinate, he was "responding to act of racial discrimination." (56.1 Opp'n ¶ 41). No evidence is cited in support of Plaintiff's proposition.

[5] Plaintiff asserts that he was suspended because Defendants did not want "to answer for their systematic racial discrimination against Plaintiff and others under Defendants' employ" and that "he was suspended for attempting to bring this racial discrimination to light." (56.1 Opp'n ¶ 42). No evidence is cited in support of this statement.

findings and terminated Plaintiff's probationary employment on March 16, 2017.[6] (56.1 Stmt. ¶ 58 (citing Mehnert Decl. Ex. O, "Termination Ltr.")). Plaintiff was informed that his probationary appointment was being terminated "due to repeated instances of workplace misconduct notwithstanding counselings [sic], reprimands and warnings regarding [his] conduct at work." (Termination Ltr.).

V.   <u>Other Workplace Issues</u>

Apart from the workplace incidents that generated incident reports, Plaintiff had other issues during his tenure of employment with the City's Water Department. First, while Plaintiff was required to obtain a NYS Grade D Water Systems Certificate within one year of beginning his employment with the City, he did not obtain his certificate until after his one-year anniversary had passed. (56.1 Stmt. ¶¶ 24-25). Additionally, on two separate occasions, first in March 2015 and then in November 2015, Plaintiff was placed on the City's sick leave monitoring program due to the potentially improper use of his sick days. (*Id*. ¶¶ 26, 34 (citing Mehnert Decl. Exs. F, G)).

VI.   <u>Plaintiff Interviews for Maintenance Mechanic Position</u>

In February 2016, Vradenburgh was scheduled to interview Plaintiff for an open Maintenance Mechanic position. (*Id*. ¶ 47 (citing McNeil Dep. at 49:16-50:4)). Vradenburgh had prepared a list of questions to ask Plaintiff during the interview and while Vradenburgh was out of the room, Plaintiff reviewed the questions. (*Id*. ¶ 48 (citing McNeil Dep. at 51:9-12)). The first question on the list was: "Can you name a time that you . . . had a conflict or you had a dispute with your supervisor?" (*Id*. ¶ 49 (citing McNeil Dep. at 51:14-18)). After Vradenburgh returned to the room, Plaintiff told him that he was declining to be interviewed for the Maintenance Mechanic

---

[6] Plaintiff again disputes the basis for the conclusions reached by the investigator and adopted by the City. Plaintiff states that his termination for insubordination was merely a "pretext . . . to prevent Defendants from having to answer for their systematic racial discrimination." (56.1 Opp'n ¶ 58). Plaintiff cites to no evidence in support of this statement.

position.[7] (*Id*. ¶ 51 (citing McNeil Dep. at 51:5-6)).

## **STANDARD OF REVIEW**

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, No. 17-CV-3875, 2020 WL 917294, at *4 (S.D.N.Y. Feb. 26, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence. The task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress*

---

[7] Plaintiff states, in his opposition to Defendant's Rule 56.1 Statement and without citation to any evidence in support thereof, that Plaintiff "kn[ew] full well that [Vradenburgh] intended to deny Plaintiff an opportunity for advancement on the basis of his race." (56.1 Opp'n ¶ 48; *see also id.* ¶¶ 49-51).

& Co., 398 U.S. 144, 157 (1970)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The opponent cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to raise an issue of material fact with respect to an essential element of her[] claim, the District Court properly granted summary judgment dismissing that claim"). Simply put, the movant must separately establish that the law favors the judgment sought.

## <u>ANALYSIS</u>

I.   <u>Title VII Claim</u>

Plaintiff asserts a Title VII race discrimination claim against the City alleging that he suffered adverse employment actions on the basis of his race. "Claims of discrimination under

Title VII are analyzed at the summary judgment stage under the burden-shifting test announced by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Howard v. City of New York*, 302 F. Supp. 2d 256, 260 (S.D.N.Y. 2004), *aff'd*, 363 F. App'x 805 (2d Cir. 2010). Phase one of the *McDonnell Douglas* test places upon the plaintiff the burden of establishing a *prima facie* case of discrimination by alleging "(1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he was subject to an adverse employment action; [and] (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on race." *Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff sets forth a *prima facie* case of discrimination, "the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action." *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013), *aff'd*, 586 F. App'x 739 (2d Cir. 2014) (quoting *McDonnell Douglas*, 411 U.S. at 802-03). "If the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the *prima facie* case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

A.  Phase One: *Prima Facie* Case

The City argues that Plaintiff's Title VII claim fails because Plaintiff has not stated a *prima facie* case of race discrimination. Specifically, Defendants argue that Plaintiff cannot satisfy the fourth element—*i.e.* no reasonable jury could find Plaintiff suffered an adverse employment action

that occurred under circumstances giving rise to an inference of race discrimination. (Defs. Br. at 9-13).[8]

"[T]he burden on the plaintiff of presenting a prima facie case of discrimination under *McDonnell Douglas* is 'minimal.'" *Bailey v. Colgate-Palmolive Co.*, No. 99-CV-3228, 2003 WL 21108325, at *16 (S.D.N.Y. May 14, 2003), *aff'd*, 93 F. App'x 321 (2d Cir. 2004) (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)). Specific to the fourth element of a *prima facie* race discrimination claim, the standard is "flexible" and "can be satisfied differently in differing factual scenarios." *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)); *see also Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 329 (S.D.N.Y. 2020) ("The facts required to meet this element of the *prima facie* case will 'inevitably vary in different employment discrimination cases.'" (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001))). While the burden on a plaintiff is minimal, "purely conclusory allegations of discrimination, absent any concrete particulars," will not suffice. *Smith*, 440 F. Supp. 3d at 328 (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). "Circumstances which may give rise to an inference of discrimination include 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse action].'" *Id*. (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)).

---

[8] Defendants do not challenge whether Plaintiff can satisfy the other elements of a *prima facie* race discrimination claim and thus the Court considers Defendants to have waived any argument concerning the *prima facie* showing as to the other elements of such a claim. *R.R. v. Scarsdale Union Free Sch. Dist.*, 366 F. App'x 239, 242 (2d Cir. 2010) ("[A]rguments not made in an appellant's opening brief are waived.").

Plaintiff alleges that the adverse employment actions he suffered occurred "in a manner dissimilar and unequal to the care and/or treatment furnished Caucasian co-workers who were/are accused of similar employment related infractions and/or misconduct." (Compl. ¶ 30). Plaintiff claims further that "but for" his membership in a protected class "he would not have been disciplined, suspended and/or terminated by the defendant City" and that Plaintiff's Caucasian co-workers who engaged in "identical conduct" were not similarly disciplined. (*Id.* ¶¶ 32-33). In light of the fact that the burden of establishing a *prima facie* case is minimal and given the non-conclusory nature of the allegations, the Court finds that Plaintiff has satisfied his phase one burden and moves to phase two of the *McDonnell Douglas* standard.

## B.  Phase Two: Legitimate Non-Discriminatory Rationale

At phase two, "the burden of production [] shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action." *Wesley-Dickson*, 973 F. Supp. 2d at 397 (quoting *McDonnell Douglas*, 411 U.S. at 802-03). Here, Plaintiff suffered multiple adverse employment actions including (1) failure to receive a promotion, (2) suspension without pay on two occasions, and ultimately, (3) termination.[9] *See Witek v. City of New York*, 807 F. App'x 52, 54 (2d Cir. 2020) ("[T]ermination certainly constitute[s an] adverse employment action[]"); *Mills v. S. Connecticut State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013) ("[T]he alleged failure to promote [plaintiff] constitutes an adverse employment action."); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) ("[S]uspension without pay is sufficient to constitute

---

[9] While Plaintiff speaks of adverse employment actions in general terms (Compl. ¶ 29), these are the only adverse employment actions suffered by Plaintiff. Plaintiff's placement on the City's sick leave monitoring program and/or receipt of a Counseling Memorandum, for example, are not adverse employment actions. *See Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 304 (2d Cir. 2017) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." (quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000))).

an adverse employment action."). Based on the evidence in the record, no reasonable jury could find that that the City failed to satisfy its burden of establishing that there were legitimate non-discriminatory reasons for the adverse employment actions.

First, regarding the failure to promote Plaintiff to be a Maintenance Mechanic, Plaintiff testified that he declined to be interviewed for the position. (56.1 Stmt. ¶ 51 (citing McNeil Dep. at 54:15-19 ("Q. Okay. And after Mr. Vradenburgh left the room, you reviewed the questions, and then did what? A. When he came back in the room, I politely declined the interview."))). Clearly, Plaintiff's decision to decline to be interviewed for the job is a legitimate non-discriminatory reason not to offer the job to him.

Second, regarding Plaintiff's suspension without pay in July and November 2016, the letters issued to Plaintiff by the City Manager on July 29, 2016 and November 15, 2016, respectively, clearly articulate the legitimate non-discriminatory reasons for suspending Plaintiff without pay. (Mehnert Decl. Ex. K (finding that Plaintiff was "insubordinate to Mr. Vradenburgh," that Plaintiff's "willful disregard for [his] supervisor's directives is unacceptable and will not be tolerated," that Plaintiff "provided false information" during the course of the investigation, and concluding Plaintiff "will be suspended without pay for four days"); Mehnert Decl. Ex. M (finding that Plaintiff was "insubordinate to Mr. Vraddenburgh when [he] refused [Vradenburgh's] directive to go home for the day," that Plaintiff's "willful disregard for [his] supervisor's directives is unacceptable and will not be tolerated," and concluding that Plaintiff "will be suspended without pay for eight days")).

Third, regarding Plaintiff's termination, Plaintiff was informed that his probationary appointment was being terminated "due to repeated instances of workplace misconduct notwithstanding counselings [sic], reprimands and warnings regarding your conduct at work."

(Termination Ltr.). The multiple instances of insubordination by Plaintiff towards his supervisors, conflicts with fellow co-workers, and untruthfulness in the course of the investigations are legitimate non-discriminatory reasons for terminating Plaintiff's probationary status. *See, e.g.*, *Lindsay v. Harris*, 50 F. App'x 61, 61 (2d Cir. 2002) ("[P]oor work performance, tardiness and insubordination . . . are legitimate non-discriminatory reasons" for discharge); *Hartley v. Rubio*, 785 F. Supp. 2d 165, 179 (S.D.N.Y. 2011) (finding "that defendants have met their burden of articulating a legitimate, nondiscriminatory reason for reassigning and terminating [plaintiff]" because defendants asserted the plaintiff "acted in an insubordinate fashion" and "was unprofessional and disruptive"); *Rikhy v. AMC Computer Corp.*, No. 01-CV-7007, 2003 WL 1618529, at *4 (S.D.N.Y. Mar. 28, 2003), *aff'd*, 95 F. App'x 388 (2d Cir. 2004) ("Insubordination and threatening behavior both constitute legitimate non-discriminatory reasons for discharge in this Circuit").

The Court's finding that there is no triable issue of fact as to whether the City offered legitimate non-discriminatory reasons for the adverse employment actions is bolstered by the fact that the City did not discipline Plaintiff until the third-party investigator retained by the City to investigate allegations of workplace misconduct had issued his final report recommending the discipline ultimately dispensed by the City to Plaintiff. (*See generally* Apr. City Rep.; June City Rep.). The reasons offered by the City for the adverse employment actions suffered by Plaintiff, separately and together, constitute legitimate non-discriminatory reasons. *See Sanders v. Mount Sinai Med. Ctr.*, No. 98-CV-828, 1999 WL 1029734, at *7 (S.D.N.Y. Nov. 10, 1999) ("Defendant has established a legitimate non-discriminatory reason for plaintiff's termination by presenting substantial evidence that illustrates a pattern of unsatisfactory performance"). Accordingly, the

14

City offered legitimate non-discriminatory reasons for each of the adverse employment actions Plaintiff suffered.

C.   Phase Three: Pretext

At phase three of the *McDonnell Douglas* burden shifting analysis, the burden shifts back to Plaintiff "to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was." *Wesley-Dickson*, 973 F. Supp. 2d at 397. This requires Plaintiff to "come forward with 'sufficient evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].'" *Hartley*, 785 F. Supp. 2d at 180 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)); *see also Rajcoomar v. TJX Companies, Inc.*, 319 F. Supp. 2d 430, 438 (S.D.N.Y. 2004) ("The Supreme Court has articulated that 'a reason cannot be proved to be a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.'" (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993))). To show pretext, "a plaintiff must submit admissible evidence showing circumstances to permit a rational finder of fact to find that the defendant's conduct was motivated in whole or in part by discrimination." *Rajcoomar*, 319 F. Supp. 2d at 438. The admissible evidence offered by a plaintiff must go beyond "self-serving and conclusory allegations that the defendants' proffered reasons were false." *Hartley*, 785 F. Supp. 2d at 180 (citing *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.1995)); *Alleyne v. Four Seasons Hotel*, No. 99-CV-3432, 2001 WL 135770, at *11 (S.D.N.Y. Feb. 15, 2001), *aff'd sub nom.*, 25 F. App'x 74 (2d Cir. 2002) ("The plaintiff [] fails to offer any acts, statements, or admissions by a decision-maker to support her allegations of bias . . . and the plaintiff's conclusory and self-serving allegations   that   she   was   discriminated   against   are

insufficient to demonstrate that [defendants'] nondiscriminatory reasons were a pretext for discrimination."). "Moreover, an employer's decisions are given deference by the court unless they are clearly pretextual." *Hartley*, 785 F. Supp. 2d at 180 (citing *Deabes v. Gen. Nutrition Corp.*, 415 Fed. App'x 334, 336 (2d Cir. 2011)).

Plaintiff argues that Caucasian employees at the Water Department received better treatment than African American employees and that the adverse employment actions were motivated by impermissible racial animus. (Pl. Br. at 6-7). Plaintiff's sole support for these arguments is his own deposition testimony. While Plaintiff argues that his "deposition transcript is replete with specific examples of Vradenburgh's discriminatory treatment of [Plaintiff] and his African/American co-workers as contrasted with his treatment of his Caucasian co-workers" (Pl. Br. at 6), a close review of the deposition transcript reveals only vague and conclusory allegations. When Plaintiff was asked specifically for examples of workplace conduct that demonstrate that he was the victim or target of race discrimination while employed by the City, Plaintiff offered only the following examples: (1) when Plaintiff was terminated, he was escorted off the premises by police officers (McNeil Dep. at 207:8-23); (2) on multiple occasions Caucasian employees made disparaging comments to Vradenburgh and Plaintiff believes these employees were not adequately disciplined (*id*. at 210:4-212:12); (3) on one occasion, Plaintiff entered a room "where the other white employees were all present at work . . . and there [was] an array of boxes on the ground. . . . [Vradenburgh] came in the office, and he had seen [the white employees] there. And when [Plaintiff] came in the office, [Plaintiff] was directed to pick those boxes up" (*id*. at 212:22-213:5); (4) on another occasion, Plaintiff was instructed to weed whack while his Caucasian counterparts were not directed to weed whack (*id*. at 214:7-25); (5) Plaintiff was always "placed to the back" while new employees were given opportunities to "further their growth and development" (*id*. at

217:5-10); (6) Plaintiff was told that he had to be a City resident while employed by the Water Department, but certain other employees did not reside within the City limits (*id*. at 218:17-219:25); and (7) Vradenbugh stood in front of Plaintiff during a training session (*id*. at 220:5-8). Plaintiff testified that he was never told he was being disciplined because of his race (*id*. at 220:12-18) and Vradenburgh never made racially disparaging comments towards him (*id*. at 220:19-21).

Neither Plaintiff's opposition to the Rule 56.1 Statement nor his opposition brief cite to any other evidence in the record that support a finding that the true reason for the adverse employment actions suffered by Plaintiff was racial bias. Rather, Plaintiff offers only his own self-serving, vague, general, and conclusory testimony to establish that the legitimate non-discriminatory reasons offered by the City were pretextual. This testimony, standing alone, is insufficient proof to create a triable issue of fact. *See Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (finding that "the only evidence cited in plaintiffs' brief is their own self-serving testimony" and that because "plaintiffs have made no attempt to square their own speculative, and subjective, testimony with the hard evidence adduced during discovery" plaintiff's "evidence is insufficient to defeat summary judgment." (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)) (internal quotation marks and alterations omitted)). Indeed, to be actionable, Plaintiff must offer proof in admissible form and beyond the four corners of his own mind. The Court concludes that no rational trier of fact, even when viewing the evidence in the light most favorable to the Plaintiff, could conclude that the City's proffered explanations for Plaintiff's termination were merely a pretext for a decision based on race. Accordingly, the Court grants Defendants summary judgment on Plaintiff's Title VII claim.

II.   Section 1981 Claim

"Section 1981 provides, in pertinent part, that '[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . .'" *Patterson v. Cty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004) (quoting 42 U.S.C. § 1981(a)) (alterations in original)). Section 1981 "thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Id.* Defendants argue that Plaintiff's Section 1981 claim should be dismissed because Section 1981 does not provide a private right of action against state actors and both Defendants are state actors. (Defs. Br. 15-16).

The Complaint is not clear as to whether Vradenburgh is being sued in his official capacity or his individual capacity. (*See generally* Compl.). In his opposition brief, Plaintiff appears to argue that Vradenburgh was sued in his individual capacity. (Pl. Br. at 7-8). Ultimately, it is of no consequence because Plaintiff's Section 1981 claims are dismissed in either circumstance.

To the extent Vradenburgh was sued in his official capacity, such a claim is construed by the Court as a claim against the City itself. *Patterson*, 375 F.3d at 226. Defendants are correct that Section 1981 does not provide a private right of action against state actors. *See Gachette v. Metro-N. Commuter R.R. Co.*, 804 F. App'x 65, 66 (2d Cir. 2020) ("[Plaintiff's] federal discrimination claim under § 1981 fails, because that statute 'does not provide a separate right of action against state actors.'" (quoting *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018))); *Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 284 (S.D.N.Y. 2019) ("[T]he Second Circuit made clear that '§ 1981 does not provide a separate private right of action against *state actors*." (quoting *Duplan*, 888 F. 3d at 621) (emphasis in original)); *Johnson v. City of New York*, No. 16-CV-6426, 2018 WL 1597393, at *20 (E.D.N.Y. Mar. 31, 2018) ("[S]ection 1981's implied private

right of action may not lie against state actors."). Thus, the Court dismisses Plaintiff's Section 1981 claim asserted against the City and Vradenburgh sued in his official capacity.

To the extent Vradenburgh was sued in his individual capacity, because the standards under Title VII and Section 1981 are the same, *Tilghman v. Waterbury Bd. of Educ.*, 154 F. App'x 221, 223 (2d Cir. 2005) ("[T]he core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause." (citing *Patterson*, 375 F.3d at 225)), the Court finds that Plaintiff's Section 1981 claim against Vradenburgh in his individual capacity is fatal for the same reasons that his Title VII claim against the City failed. Accordingly, Plaintiff's Section 1981 claim is dismissed.

III.   First Amendment Claim

Plaintiff claims that he was retaliated against for speaking out about health and safety conditions at the City's Water Department. (Compl. ¶¶ 43-45). Such retaliation was allegedly in violation of Plaintiff's First Amendment rights.[10] To prevail on a First Amendment retaliation claim "a plaintiff must prove by a preponderance of the evidence that (1) the expression at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected expression, and (3) a causal relationship existed between the constitutionally protected expression and the retaliatory action." *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003). Defendants argue in their opening brief that Plaintiff cannot satisfy the first and third elements of a First Amendment retaliation claim. (Defs. Br. at 16-19). Plaintiff, for

---

[10] While Count Three of the Complaint asserts a "First and Fifth Amendment/Retaliation" claim, there are no allegations sounding in a Fifth Amendment violation. In any event, because the "Fifth Amendment only applies to claims against the federal government," *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 412 (S.D.N.Y. 2013), to the extent Plaintiff intended to assert a Fifth Amendment claim, such a claim is dismissed.

his part, stated his intent to withdraw his First Amendment claim in his opposition brief. (Pl. Br. at 1). Accordingly, the Court finds that Plaintiff has conceded that his First Amendment claim is fatal as a matter of law and abandoned the claim. *See, e.g.*, *McGriff v. Keyser*, No. 17-CV-7307, 2019 WL 6033421, at *12 (S.D.N.Y. Nov. 13, 2019) (noting that Plaintiff has abandoned claim "by failing to address any arguments on this issue in his [o]pposition brief."); *Cole v. Blackwell Fuller Music Publ'g, LLC*, No. 16-CV-7014, 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018) ("Numerous courts have held that a plaintiff's failure to address an issue in its opposition raised by its adversary amounts to a concession or waiver of the argument.").[11]

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment. The Clerk is instructed to terminate the pending motion (Doc. 39) and terminate this action.

SO ORDERED:

Dated: New York, New York
February 26, 2021

_____
Philip M. Halpern
United States District Judge

---

[11] Even if the Court did not conclude that Plaintiff had abandoned his First Amendment claim, the Court would nonetheless find that Plaintiff failed to state a First Amendment retaliation claim for relief. Speech related to an employee's job duties and responsibilities is not protected speech. *See, e.g.*, *Bloomberg v. New York City Dep't of Educ.*, 410 F. Supp. 3d 608, 620 (S.D.N.Y. 2019). Furthermore, because the Court finds that summary judgment for Defendants is appropriate on all of Plaintiff's claims for relief, the Court need not and does not address whether Vradenburgh would be protected by qualified immunity. (*See* Defs. Br. at 20-21).